UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2013 JUL 16  PM 3: 00

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | (FILED UNDER SEAL) |
| | ) | |
| v. | ) | Cause No. 1:13-      -CR |
| | ) | |
| GUOQING CAO, | ) | **1 : 13 -cr- 0 1 5 0 WTL -TAB** |
| SHUYU LI, | ) | |
| a/k/a "Dan," | ) | |
| | ) | |
| Defendants. | ) | |

## INDICTMENT

The Grand Jury charges that:

### BACKGROUND

At all times relevant to this Indictment:

#### Eli Lilly and Company

1.      Eli Lilly and Company (Lilly), the 10th largest pharmaceutical company in the world, was founded on May 10, 1876, and is headquartered in Indianapolis, Southern District of Indiana, with offices in the People's Republic of China, among other places.  Lilly employs approximately 38,000 people worldwide including in excess of 10,000 individuals in Indiana. Lilly's research focuses on innovative discoveries to address unmet medical needs in five main global business areas:  (1) bio-medicines including cardiovascular disease; (2) diabetes; (3)

1

oncology; (4) animal health; and (5) emerging markets.  Lilly markets its products in 125 countries worldwide.

2.      Through years of work, Lilly has engaged in proprietary research to identify intervention points where drugs can best affect the disease state.  This drug discovery and development process begins with Lilly scientists searching for biological targets that play a role in a given disease and if successful, concludes with a drug approved for patient use.  On average, the process takes ten to fifteen years and requires the examination of between 5,000 to 10,000 compounds to gain approval of a single drug for patient use.  There are several steps in the process:

(1) establishing the disease state; (2) identifying the targets of interest:  generating hypotheses regarding points of intervention and proposing pharmacological targets that may be relevant to the treatment; (3) validating the targets:  performing experiments and developing tests that demonstrate the proposed target may be pharmacologically modified to influence a disease state; (4) identifying hits:  testing selected molecules to identify hits—molecules whose relationship at the target yields drug-like molecules; (5) hits to leads:  designing and preparing leads and structures based on the hits; (6) lead optimization:  refining and evaluating the leads to determine margin of safety and identifying compounds of interest; (7) candidate selection: further refinement to identify candidate selection; and (8) clinical trials:  identifying candidates that meet safety and efficacy criteria to advance to human clinical trials.  The disclosure of Lilly's strategic focus and interest in a research target at any stage of the drug discovery and development process impairs Lilly's competitive advantage in significant ways.

Cardiovascular Disease

2

3.    Nearly half of Lilly's mid-to-late stage pipeline assets are found in its diversified Bio-Medicines area. Lilly has invested significant resources towards the development of clinical candidates in the area of cardiovascular disease prevention and treatment.

4.    Trade Secret One

In 2006, Lilly scientists validated a prime target protein that reduces low-density lipoprotein cholesterol for cardiovascular disease prevention and treatment. The development of an antibody to this prime target protein by Lilly scientists was first publically disclosed by Lilly in October 2012. The research path is currently ongoing. Lilly's selection, validation and decision to pursue this target and the status of the program are Trade Secret One.

Diabetes

5.    Lilly has made substantial investments in research and development to produce a treatment platform that addresses the specific, individualized needs of people living with diabetes. In 1923, Lilly introduced the world's first commercial insulin. This foray into diabetes care has continued through Lilly's commitment to develop drugs and support programs that are intended to fight the growing diabetes epidemic.

6.    Trade Secret Two

In 2008, Lilly made advancements towards the development of a small molecule Inhibitor, explored as a "target of interest" for managing dietary fat absorption and resulting in a new approach to the treatment of diabetes, dyslipidemia, and obesity. Lilly's expansive research and development involved in the pursuit of this "target of interest" culminated in a selection of a compound for human clinical trials in or around July 2011. Lilly's selection, validation and decision to pursue this target and the status of the program are Trade Secret Two.

7.   Trade Secret Three

In 2004, Lilly identified a member of the nuclear receptor family of transcription factors as a "target of interest," explored for the treatment of dyslipidemia (abnormal cholesterol levels in the blood). In or around 2010, after six years of dedicated research and development, Lilly scientists discovered toxicity and its research was discontinued. The toxicity discovered, however, propelled Lilly's research forward and streamlined the company's efforts to identify drugs that would be used to prevent and treat dyslipidemia, an important marker for metabolic syndrome. Lilly's selection, validation and decision to pursue this target, the status of the program, as well as the reason for its discontinuation are Trade Secret Three.

8.   Trade Secret Four

In May 2009, Lilly conducted genetic knockout testing on living organisms in an effort to identify enhanced treatments of metabolic disorders. Trade Secret Four is the data Lilly compiled from this genetic testing.

9.   Trade Secrets Five and Six

In May 2009, Lilly compared heterozygous and homozygous living organism genomes (the complete copy of the organism's gene instructions) to wild type genomes in an effort to further their efforts to combat metabolic syndrome. Trade Secret Five is the data compiled with the heterozygous genomes. Trade Secret Six is the data compiled with the homozygous genomes.

Oncology

10.   Significant research and development is devoted through Lilly Oncology to speed innovation intended to improve outcomes for individuals facing cancer. Lilly's commitment to

4

"tailored therapies" is realized through a robust clinical stage pipeline that includes both small molecules and biologics—a comparative review of gene expression in healthy versus cancerous tissue.

11. Trade Secret Seven

In October 2011, Lilly validated a nuclear orphan receptor as an Antibody Drug Conjugate (ADC) "target of interest" for its role in the metastasis of cancer cells. Lilly is currently in the hit to lead stage seeking new molecules to be developed as cancer treatments. Lilly's selection and validation of this as an ADC "target of interest" is Trade Secret Seven.

12. Trade Secret Eight

Lilly has identified a cell surface receptor protein expressed in many tissues with unknown functionality (orphan genes) as a "target of interest" for drug development within its oncology platform. Lilly continues its expansive research and development involved in the validation of this "target of interest" which is Trade Secret Eight.

13. Trade Secret Nine

In December 2011, Lilly validated a protein-coding gene as an ADC "target of interest" within their oncology platform. Lilly's comprehensive research involved in the pursuit of this "target of interest" culminated in the identification of a candidate for clinical development in February 2013. Lilly's selection and validation of this as an ADC "target of interest" is Trade Secret Nine.

Reasonable Measures

14. Lilly employed several layers of security to preserve and maintain confidentiality and to prevent unauthorized use or disclosure of its trade secrets at both its headquarter offices in

Indianapolis, Indiana and its offices in the People's Republic of China.  These steps were enforced to maintain Lilly's competitive advantage and to maintain the integrity of years of research and development with its products.

15. The security measures undertaken by Lilly in both Indianapolis, Indiana and in the People's Republic of China included the following:

A. Limiting physical access, including guard restricted and card reader access to the Lilly campus;

B. Additional physical security measures included guard issued visitor badges, monitored entrance points, and recorded campus entry access.

C. Requiring employee confidentiality agreements that extended beyond the length of employment at Lilly during Lilly on-boarding orientation process;

D. Recurrent training and instruction regarding the security and safeguarding of Lilly confidential and trade secret information;

E. Restricting use of all Lilly confidential information to use in the performance of Lilly company business by employees with a need to know;

F. Limiting access to Lilly computer networks;

G. Data security banners and policies;

H. Restrictive guidelines and specific authorization required to publish or discuss Lilly confidential material outside the company.

Lilly Trade Secrets

6

16.     Some of the Lilly trade secrets that were related to a product intended for use in interstate or foreign commerce, included:

| Trade Secret | General Description |
|---|---|
| Trade Secret One | Lilly's validation of a prime target protein that reduces low-density lipoprotein cholesterol as a target of interest |
| Trade Secret Two | Lilly's validation of a small molecule inhibitor as a target of interest for managing dietary fat absorption |
| Trade Secret Three | Lilly's validation and termination of a member of the nuclear receptor family of transcription factors as a target of interest for the treatment of dyslipidemia |
| Trade Secret Four | The gene identified by Lilly for knockout genetic testing to expand the treatment of metabolic disorders |
| Trade Secret Five | Lilly's data compilation from the comparison of heterozygous v. wild type mouse genome |
| Trade Secret Six | Lilly's data compilation from the comparison of homozygous v. wild type mouse genome |
| Trade Secret Seven | Lilly's validation of a nuclear receptor as an ADC target of interest for the treatment of cancer |
| Trade Secret Eight | Lilly's plan to research the functionality of a cell surface receptor protein expressed in many tissues for the treatment of cancer |
| Trade Secret Nine | Lilly's validation of a protein-coding gene as an ADC target of interest for the treatment of cancer |

<u>Defendant Cao's Position, Assignment, and Obligations with Lilly</u>

17.     Defendant GUOQING CAO was born in the People's Republic of China and obtained United States citizenship on January 24, 2002.

18.     Beginning in or around June 1999 until on or about August 10, 2005 and again beginning on or about September 28, 2005 until on or about January 10, 2012, defendant GUOQING CAO was employed at Lilly as a senior biologist and a research advisor.  In or

around 2009, GUOQING CAO was assigned to lead early aspects of Lilly's efforts in diabetes

and cardiovascular research at its offices in Indianapolis, Indiana.

19.    In 2001, defendant GUOQING CAO was advised of a Lilly Confidentiality and

Invention Agreement which outlined his obligations in handling Lilly information.  This

agreement provided, in pertinent part:

> Lilly owns all information relating to its products, processes, services,
> research, and other business pursuits that is not generally known
> outside Lilly and from which Lilly could derive economic value.

> Employees shall not disclose such information to anybody outside
> Lilly without written permission and shall not make use of that
> information other than in work for Lilly.

> All ideas, inventions, discoveries, and improvements conceived
> or reduced to practice in the course of employment with Lilly are
> Lilly property.  All employees shall help Lilly get and retain
> title to them.

20.    In 2003 and annually between 2005 and 2011, defendant GUOQING CAO

completed Red Book training concerning Lilly Standards of Business Conduct policies and

procedures, to include, but not be limited to, the handling of Lilly information and inventions.

This Lilly Red Book training:  defined confidential information to include all information and

inventions developed by employees and other materials related to company business not known

or available outside the company; defined trade secret information to be confidential information

that has economic value; provided explicit direction regarding Lilly employees' ongoing

obligation to protect the company's assets and not disclose confidential information; and

provided suggestions to avoid accidental disclosure to include, but not be limited to, not

8

discussing company confidential information with anyone other than Lilly employees with a need to know.

Individual #1's Position, Assignment, and Obligations with Lilly

21.     Individual #1 was born in the People's Republic of China and obtained United States citizenship on September 25, 2003.

22.     Beginning in or around March 23, 1998 until on or about July 11, 2008, Individual #1 was employed at Lilly as a senior chemist and research advisor. In or around October 2005, Individual #1 was assigned to lead aspects of Lilly's efforts in the area of metabolic disorders including diabetes at its offices in Indianapolis, Indiana.

23.     On or about March 23, 1998, Individual #1 was advised of and agreed to an Employee Nondisclosure and Developments Agreement which outlined his obligations in handling confidential information. This agreement provided, in pertinent part:

> Except as may be required in connection with the operations of the Company's [Lilly's] business, Employee will not at any time, whether during or after the termination of his/her employment, reveal to any person or entity any of the trade secrets or confidential information concerning the organization, business or finances of the Company . . .(including, but not limited to trade secrets or confidential information respecting inventions, research, products, designs, methods, knowhow, formulae, techniques, systems, processes, software programs, works of authorship, customer lists, projects, plans and proposals) . . .and Employee shall keep secret all matters entrusted to him/her and shall not use or attempt to use any such information in any manner which may injure or cause loss or may be calculated to injure or cause loss whether directly or indirectly to the Company.

24.     On May 22, 2001, Individual #1 was advised of a Lilly Confidentiality and Invention Agreement which outlined his obligations in handling confidential information, as set forth in paragraph 19, above.

9

25.   In 2000 and 2001, Individual #1 completed training regarding the protection of Lilly trade secrets and innovations, among other things.  In 2003, 2005, 2006, and 2007, Individual #1 completed Red Book training, among other training modules, concerning Lilly Standards of Business Conduct policies and procedures, to include, but not be limited to, the handling of Lilly information and inventions, as set forth in paragraph 20, above.

Defendant Li's Position, Assignment, and Obligations with Lilly

26.   Defendant SHUYU LI, a/k/a "Dan," was born in the People's Republic of China and obtained United States citizenship on October 8, 2009.

27.   Beginning in or around August 19, 2002 until on or about May 21, 2013, defendant SHUYU LI, a/k/a "Dan," was employed at Lilly as a senior biologist.  In or around October 2007, SHUYU LI, a/k/a "Dan," was assigned to lead aspects of Lilly's cancer bioinformatics efforts.  Subsequently, on or about March 1, 2012, SHUYU LI, a/k/a "Dan," was reassigned to lead Lilly's information technology team in China, where his responsibilities included the protection of Lilly information.

28.   On or about August 19, 2002, defendant SHUYU LI, a/k/a "Dan," was advised of a Lilly Confidentiality and Invention Agreement which outlined his obligations in handling confidential information, as set forth in paragraph 19, above.

29.   In 2002, defendant SHUYU LI, a/k/a "Dan," completed training regarding the protection of Lilly trade secrets and innovations, among other things.  In 2003, 2005, 2006, 2007, 2009, 2010, 2011, SHUYU LI, a/k/a "Dan," completed Red Book training, among other training modules, concerning Lilly Standards of Business Conduct policies and procedures, to include,

10

but not be limited to, the handling of Lilly information and inventions, as set forth in paragraph 20, above.

## COUNTS ONE through THREE

(Theft of Trade Secrets and Aiding and Abetting)

[18 U.S.C. §§ 1832(a)(2) and 2]

30.     The allegations set forth in the Background Section found in Paragraphs One through Twenty-Nine of this Indictment are hereby realleged and incorporated by reference as if set forth in full herein.

31.     Between on or about the dates set forth below, in the Southern District of Indiana, and elsewhere, the defendant,

GUOQING CAO,

with the intent to convert a trade secret to the economic benefit of someone other than Lilly, and intending and knowing that the offense would injure Lilly, did knowingly and without authorization copy, download, upload, transmit, deliver, send, mail, communicate, and convey such information, to-wit:  specific Lilly trade secrets set forth below, which were related to a product that is intended for use in interstate and foreign commerce:

| Count | Dates | Trade Secret |
|-------|-------|--------------|
| 1 | February 22, 2010 -  January 11, 2012 | Trade Secret One |
| 2 | February 22, 2010 -  January 11, 2012 | Trade Secret Two |

| 3 | February 22, 2010 - January 11, 2012 | Trade Secret Three |
|---|---|---|

## General Allegations

The general allegations are as follows:

32.    Individual #1, a former employee of Lilly, who, at the time of the events pertaining to Counts One through Three, was an employee of Jiangsu Hengrui Medicine Co., Ltd., located in Shanghai, People's Republic of China ("Hengrui"), communicated with GUOQING CAO, who, during the majority of the time and of the events pertaining to Counts One through Three, was a Lilly employee.

33.    Individual #1 directed GUOQING CAO to focus on cardiovascular disease and diabetes.

34.    GUOQING CAO misappropriated Lilly confidential and trade secret information and, knowing it would benefit Hengrui, an overseas competitor with Lilly, divulged Lilly trade secret information to Individual #1 without first requesting or obtaining Lilly permission or authorization.

## Specific Allegations

35.    On February 22, 2010, GUOQING CAO sent his resume electronically to Individual #1 for consideration as an employee of Hengrui, a pharmaceutical company competing with Lilly in the global market.

36.    On March 18, 2010, GUOQING CAO sent an e-mail to an individual in which CAO expressed dissatisfaction with his current employment.

37.     On April 7, 2010 and May 17, 2010, GUOQING CAO sent an e-mail to Individual #1 discussing future travel plans to China and CAO's desire to meet with Individual #1.

38.     On May 18, 2010, Individual #1 sent an e-mail to GUOQING CAO advising that CAO would meet with a Hengrui official during his trip to China.

39.     On May 18, 2010, GUOQING CAO attached four external storage devices to his Lilly computer located in Indianapolis, Indiana.

40.     Between May 27, 2010 and June 10, 2010, GUOQING CAO traveled to China and met with Hengrui officials, among other things.

41.     Between June 11, 2010 and August 23, 2010, among other dates, GUOQING CAO actively recruited individuals to make presentations at an upcoming conference in China on behalf of Individual #1.

42.     On August 24, 2010, GUOQING CAO sent an e-mail to Individual #1 discussing future travel plans to China.

43.     Beginning on or about October 15, 2010, GUOQING CAO began forwarding Lilly authored papers to his personal e-mail address.

44.     On October 20, 2010, GUOQING CAO participated in a refresher Lilly Red Book training course that specifically addressed the protection of Lilly confidential and trade secret material.

45.     On October 22, 2010, Individual #1 urged GUOQING CAO to continue recruiting scientists for networking purposes and to collaborate in the submission of Chinese grant applications that would be submitted for funding to support Hengrui's research and development.

13

46.     Between November 2, 2010 and November 14, 2010, GUOQING CAO traveled to China and met with Hengrui officials, among other things.

47.     On January 28, 2011, GUOQING CAO forwarded his Lilly contacts to his personal e-mail address.

48.     On February 25, 2011, GUOQING CAO attached an external storage device to his Lilly computer located in Indianapolis, Indiana.

49.     On April 2, 2011, Individual #1 sent an e-mail to GUOQING CAO, advising that Individual #1 had recommended CAO to be a key member of a Chinese grant application that would be submitted by Hengrui for grant funding, and requested that CAO focus on cardiovascular disease and diabetes research.

50.     On April 7, 2011, Individual #1 sent an e-mail to GUOQING CAO, advising CAO that a job offer from Hengrui would be forthcoming.

51.     On April 29, 2011, GUOQING CAO received confirmation and an itinerary for his upcoming travel to China.

52.     On May 16, 2011 and May 18, 2011, GUOQING CAO attached external storage devices to his Lilly computer located in Indianapolis, Indiana.

53.     On May 26, 2011, GUOQING CAO requested and was denied by Lilly approval to present on a specific topic at an upcoming conference.

54.     Between May 30, 2011 and June 10, 2011, GUOQING CAO traveled to China and met with Hengrui officials, among other things.

55.     In July 2011, GUOQING CAO forwarded Lilly authored material to his personal e-mail address.

14

56.     On August 18, 2011, GUOQING CAO sent an e-mail to Individual #1 accepting Hengrui's job offer and attaching an executed employment contract with Hengrui.

57.     On August 21, 2011, GUOQING CAO misappropriated Lilly Trade Secrets One through Three by sending an e-mail containing Trade Secrets One through Three to Individual #1 to be used in a Chinese grant application to obtain financial support for Hengrui's research and development efforts without first requesting or obtaining Lilly permission or authorization.

58.     In August 2011, GUOQING CAO and Individual #1 continued to communicate electronically about Hengrui's Chinese grant applications.

59.     On August 28, 2011, GUOQING CAO and Individual #1 communicated electronically about limiting the use of CAO's name in connection with the information CAO had provided.

60.     In September 2011, GUOQING CAO uploaded Lilly confidential material to an external storage device.

61.     Between September 22, 2011 and September 28, 2011, GUOQING CAO traveled to China and met with Hengrui officials, among other things.

62.     On October 27, 2011, GUOQING CAO participated in a refresher Lilly Red Book training course that specifically addressed the protection of Lilly confidential and trade secret material.

63.     In December 2011, GUOQING CAO uploaded Lilly confidential material to an external storage device.

64.     On January 11, 2012, GUOQING CAO resigned from employment at Lilly.

All in violation of Title 18, United States Code, Sections 1832(a)(2) and 2.

## COUNT FOUR

(Conspiracy to Commit Theft of Trade Secrets)

[18 U.S.C. §§ 1832(a)(2) and 1832(a)(5)]

65.     The allegations set forth in the Background, General Allegations, and Specific Allegation Sections found in Paragraphs One through Sixty-Four of this Indictment are hereby realleged and incorporated by reference as if set forth in full herein.

66.     Between during in or about January 2012 and during in or about March 2013, in the Southern District of Indiana, and elsewhere, the defendants,

GUOQING CAO,
and
SHUYU LI, a/k/a "Dan Li,"

did conspire with each other and others unknown to the Grand Jury without authorization to copy, download, upload, transmit, deliver, send, mail, communicate, and convey trade secrets of Lilly which were related to a product that is intended for use in interstate and foreign commerce, in violation of Title 18, United States Code Section 1832(a)(2), specifically, Trade Secrets Four through Nine.

### Object of the Conspiracy

The object of the conspiracy was to obtain the benefit of research and development efforts by Lilly without making the same investment of time and money.

### Manner and Means of the Conspiracy

Among the manner and means by which the defendants would and did carry out this conspiracy were the following:

16

67.     It was part of the conspiracy that Defendant GUOQING CAO, a former employee of Lilly, who, during the majority of the conspiracy, was an employee of Hengrui in China, pursued Lilly trade secret information through communications with SHUYU LI, a/k/a "Dan," who, during the conspiracy, was an employee at Lilly in Indianapolis, Indiana and later in China.

68.     It was further part of the conspiracy that SHUYU LI, a/k/a "Dan," misappropriated Lilly confidential and trade secret information and, knowing it would benefit Hengrui, an overseas competitor with Lilly, divulged Lilly trade secret information to GUOQING CAO without first requesting Lilly permission or obtaining authorization.

69.     It was further part of the conspiracy that GUOQING CAO provided some of the misappropriated Lilly confidential information to Individual #1.

## Overt Acts

In furtherance of the conspiracy and to achieve its object, on or about the dates below, the defendants committed and caused to be committed, in the Southern District of Indiana, and elsewhere, at least one of the following overt acts, among others:

70.     In February, October and November 2012, SHUYU LI, a/k/a "Dan" communicated with GUOQING CAO about Lilly confidential information. During this time, LI e-mailed Lilly authored information to CAO without requesting or obtaining Lilly permission or authorization.

71.     After receiving the communications and attached Lilly information from SHUYU LI, a/k/a "Dan," GUOQING CAO forwarded some of the information to Individual #1.

72.     On February 21, 2012, SHUYU LI, a/k/a "Dan" sent e-mails to CAO attaching Lilly authored PowerPoint presentations that divulged Trade Secrets Four through Six.

17

73.     On November 3, 2012, GUOQING CAO provided SHUYU LI, a/k/a "Dan," with a list of five research areas CAO was interested in.

74.     On November 8, 2012, SHUYU LI, a/k/a "Dan," responded to GUOQING CAO's list by e-mailing attachments that divulged Lilly Trade Secrets Seven through Nine to GUOQING CAO to be used by Hengrui without first requesting or obtaining Lilly permission or authorization.

All in violation of Title 18, United States Code, Sections 1832(a)(2) and 1832(a)(5).

**COUNTS FIVE through TEN**

(Theft of Trade Secrets and Aiding and Abetting)

[18 U.S.C. §§ 1832(a)(2) and 2]

75.     The allegations set forth in the Background, General Allegations, Specific Allegations, Object of the Conspiracy, Manner and Means of the Conspiracy, and Overt Acts Sections found in Paragraphs One through Seventy-Four of this Indictment are hereby realleged and incorporated by reference as if set forth in full herein.

76.     Between on or about the dates set forth below, in the Southern District of Indiana, and elsewhere, the defendants,

GUOQING CAO,
and
SHUYU LI, a/k/a "Dan Li,"

with the intent to convert a trade secret to the economic benefit of someone other than Lilly, and intending and knowing that the offense would injure Lilly, did knowingly and without authorization copy, download, upload, transmit, deliver, send, mail, communicate, and convey

18

such information, to-wit: specific Lilly trade secrets set forth below, which were related to a product that is intended for use in interstate and foreign commerce:

| Count | Dates | Trade Secret |
|-------|-------|--------------|
| 5 | February 2012 | Trade Secret Four |
| 6 | February 2012 | Trade Secret Five |
| 7 | February 2012 | Trade Secret Six |
| 8 | November 2012 | Trade Secret Seven |
| 9 | November 2012 | Trade Secret Eight |
| 10 | November 2012 | Trade Secret Nine |

All in violation of Title 18, United States Code, Sections 1832(a)(2) and 2.

## FORFEITURE

1.     Pursuant to Federal Rule of Criminal Procedure 32.2, the United States hereby gives the defendants notice that the United States will seek, either civilly and/or criminally, the forfeiture of property pursuant to Title 18, United States Code, Section 2323 and Title 28, United States Code, Section 2461(c), as part of any sentence imposed.

2.     If convicted of the offenses set forth in this indictment, the defendants shall forfeit to the United States:

        a.   any article of which the disclosure is prohibited by Title 18, United States Code, Section 1832;

        b.   any property used or intended to be used, in any manner or part to commit or facilitate the commission of the offenses set forth in this indictment; and

19

    c.   any property constituting proceeds obtained directly or indirectly as a result of the commission of the offenses set forth in this indictment; or

    d.   a sum of money equal to the total amount of money involved in the offenses set forth in this indictment.

3.     If any of the property described above in paragraph two, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON

JOSEPH H. HOGSETT
United States Attorney

By: _____
CYNTHIA J. RIDGEWAY
Assistant United States Attorney

20